AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
7/25/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ____CDO____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
7/25/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: /s/ Valencia Munro  DEPUTY

United States of America

v.

MICHAEL ATTIPOE,

Defendant.

Case No.  2:24-mj-04438-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of July 24, 2024 in the County of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Fernando A. Alejandre
Complainant's signature

Fernando A. Alejandre, HSI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  7/25/24

Judge's signature

City and state:  Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
Printed name and title

AUSA: Jason A. Gorn

**AFFIDAVIT**

I, Fernando Alejandre being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Michael ATTIPOE ("ATTIPOE") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of Homeland Security Investigations in Los Angeles, California, as described more fully in Attachment A:

   a. A black iPhone with a black phone case, SIM Card Tray Number: 359664923089858, seized from ATTIPOE when he was arrested on July 24, 2024 ("SUBJECT DEVICE 1"); and

   b. A white iphone with a green phone case, SIM Card Tray Number: 352925118389818, seized from ATTIPOE when he was arrested on July 24, 2024 ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. §§ 841(a)(1) (distribution of controlled substances), and 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. § 924(c) (possessing firearms in furtherance of, or using or carrying firearms during and in relation to, drug-trafficking crimes)

(the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF AFFIANT

5. I am currently employed as a Special Agent ("SA") with United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") and have been employed since February 2022. I am currently assigned to the HSI Office of the Assistant Special Agent in Charge in El Segundo, California, as part of the Los Angeles International Airport Express Consignment and Freight Forwarding group, which is responsible for investigating drug trafficking violations involving outbound mail, air cargo, and ocean freight shipments.

## III. SUMMARY OF PROBABLE CAUSE

6. In November 2023, U.S. Customs and Border Protection ("CBP") officers seized a parcel originating in Los Angeles, California, and destined for Australia that contained five

2

kilograms of a substance that field-tested positive for methamphetamine.

7. Based on information obtained from the business where the parcel was mailed, records received from Microsoft, Google, and Charter Communications pursuant to legal process, and surveillance, HSI identified ATTIPOE as the sender of the seized parcel that contained methamphetamine.

8. On July 23, 2024, HSI LAX agents seized a mail parcel sent by ATTIPOE after observing him come and go from his residence and deliver the parcel to a FedEx facility. The parcel contained approximately two kilograms of a substance that field-tested positive for cocaine.

9. On July 24, 2024, HSI LAX agents executed a search warrant at ATTIPOE's residence and discovered approximately two kilograms of a substance that field-tested positive for cocaine and approximately 1.8 kilograms of a substance that field-tested positive for methamphetamine, along with other indicia of narcotics trafficking.

### IV. STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.     On November 30, 2023, CBP Seized a Parcel Bound for Australia Containing Approximately Five Kilograms of Methamphetamine.**

11.    Based on my conversations with Customs and Border Protection ("CBP") officers and my review of reports, I know the following:

    a.    On November 30, 2023, CBP officers in Honolulu, Hawaii, seized an international parcel destined for Australia that contained approximately five kilograms of methamphetamine.

    b.    Specifically, on that date, CBP's Honolulu Anti-Terrorism Contraband Enforcement Team ("A-TCET") flagged a UPS parcel destined for Australia (the "Australia Parcel") during a routine screening.  The Australia Parcel was shipped from West Hollywood, California, on November 29, 2023, and had a manifest that listed its contents as "Air Filter, RX400*Replacement, Cartridge *SKU RX400."  The Australia Parcel's sender was listed as the mailing service center "Sylvia WILK/ Mail Service Center 8721 Santa Monica Blvd, West Hollywood, California 90069" (the "Mail Service Center").  The Australia Parcel had a UPS tracking number of 1ZCV99850428640505.

    c.    During CBP's screening, the Australia Parcel was x-rayed, and CBP officers noticed anomalies inside of it. Further examination revealed that the Australia Parcel contained an inner box.  Inside that box were five double-vacuum-sealed bags that were wrapped in black garbage bag and incased with spray foam.

4

12. Inside of the vacuum-sealed bags, CBP officers saw a white crystalline substance. The substance field-tested positive for methamphetamine and had a gross weight of approximately five kilograms.

    **B.    HSI Identifies the sender of the Australia Parcel as Michael ATTIPOE.**

13. On December 6, 2023, I went to the Mail Service Center to request information about the Australia Parcel. I spoke with one of the Mail Service Center's employees ("Employee A"), and provided Employee A with the Australia Parcel's tracking number. Employee A searched the Mail Service Center's records regarding the Australia Parcel.

14. Based on his search of the records, Employee A informed me that he remembered the client who shipped the Australia Parcel. Employee A stated that the client introduced himself to Employee A as "Mico" and that "Mico" was very insistent on receiving an invoice for the shipment. Based on my training and experience investigating international drug trafficking and the shipment of parcels containing drugs, I know that runners (or couriers) for drug-trafficking organizations are often required by their superiors to obtain proof of a parcel's shipment to confirm that the parcel/narcotics were shipped and not stolen by the runner.

15. Employee A also told me that "Mico" provided his phone number as 424-415-0691 (the "-0691 Number") and his email address as "m.ico213@hotmail.com." Employee A described "Mico" as a black male, approximately 6 feet tall, and weighing

5

approximately 200 pounds.  Additionally, Employee A provided me with surveillance footage of "Mico" dropping off the Australia Parcel.  This footage reflects that "Mico" drove a BMW X6 to the Mail Service Center to drop off the Australia Parcel.

16.  Employee A also stated that "Mico" was very insistent on paying for taxes and duties on the Australia Parcel.  Based on my training and experience investigating international drug trafficking and the shipment of parcels containing drugs, runners (or couriers) for drug trafficking organizations often try to pre-pay taxes/duty to avoid or circumvent customs inspections at the intended destination.  Employee A told me that he informed "Mico" that it was not possible to pre-pay the taxes and duties and that it was up to the receiving country to inspect and determine the appropriate tax.

17.  After "Mico" left the store, Employee A texted the invoice for the Australia Parcel to the -0691 Number.  "Mico" responded that he did not receive the invoice and requested that Employee A send the invoice to his provided email.  Shortly after, Employee A sent the invoice to the email that "Mico" had provided, m.ico213@hotmail.com.

18.  On March 14, 2024, the Honorable Michael R. Wilner, United States Magistrate Judge, issued a warrant pursuant to 18 U.S.C. § 2703 in matter 2:24-MJ-1467, ordering Microsoft Corporation to produce all contents of all wire and electronic communications associated with the "m.ico231@hotmail.com" email address (the "Microsoft Email Account") that "Mico" had provided

6

to Employee A, the Mail Service Center's employee, in connection with the Australia Parcel.

    19.  I received Microsoft Corporation's production of data in response to this warrant on April 30, 2024. Based on my review of that data, I know the following:

        a.  On November 30, 2023, a day after "Mico" deposited the Australia Parcel at the Mail Service Center, the Microsoft Email Account received an email from another email account, mattipoe6751@gmail.com (the "Gmail Account"). The body of the email said, "test." The header information for the email identified its sender as ATTIPOE.

        b.  Moreover, on January 1, 2024, the Microsoft Email Account received an email from a cannabis dispensary reflecting a subscription to the dispensary. The email was addressed to "Michael Attipoe."

    20.  I queried immigration law enforcement databases for records relating to ATTIPOE and obtained a photographs of ATTIPOE during his entry into the U.S. and of his passport. The person depicted in that photograph matches the face of the man depicted in the surveillance footage that I obtained from the Mail Service Center showing the person who dropped off the Australia Parcel at the Mail Service Center.

    21.  Based on these facts, I believe that ATTIPOE is "Mico," the man who deposited the Australia Parcel at the Mail Service Center, and that the Gmail Account is a personal email address used by ATTIPOE.
7

22. Based on my review of the results of queries of law-enforcement databases, I know that ATTIPOE is, a United Kingdom national with no lawful immigration status in the United States.

### C. HSI Identifies ATTIPOE's Reseda Residence.

23. On March 31, 2024, the Honorable Jean P. Rosenbluth, United States Magistrate Judge, issued an order pursuant to 18 U.S.C. § 2703(d) in matter 2:24-MJ-03211, ordering Google LLC to disclose certain records and other information associated with the Gmail Account.

24. I received Google LLC's production of data in response to the March 31, 2024, order on June 4, 2024. Based on my review of that data, I know the following:

   a. The subscriber for the Gmail Account is "michael attipoe."

   b. On June 1, 2024, a user logged in to the Gmail Account using IP address 104.175.23.84.

25. On June 11, 2024, in response to an administrative subpoena, I received records from Charter Communications, Inc., regarding the IP address 104.175.23.84. Those records reflect that this IP address is affiliated with the address 7543 Enfield Avenue, Reseda, California ("Reseda Residence").

26. Due to ATTIPOE's history of signing in to the Gmail Account using the IP address 104.175.23.84, I believe ATTIPOE stayed at the Reseda Residence at some point.

**D. HSI's July 23, 2024 seizure of a ATTIPOE's two kilogram cocaine parcel addressed to the Netherlands and his suspected drug activity at the Reseda Residence.**

27. On July 23, 2024, HSI LAX and CBP Air and Marine (AMO) conducted surveillance at ATTIPOE's Reseda Residence. In speaking with other SAs, I learned that they saw ATTIPOE drive a BMW sedan to a nearby Office Depot. ATTIPOE printed what the SAs believed to be shipping labels but then ATTIPOE returned and entered Reseda Residence. Agents witnessed ATTIPOE exit the Reseda Residence and appear to place something into the trunk of his car. ATTIPOE then departed the Reseda Residence again.

28. According to other SAs with whom I have spoken, ATTIPOE conducted countersurveillance in the form of a heat run, during which he left the Reseda Residence using an indirect route that was a further distance to the main road than expected. Additionally, ATTIPOE stopped in the corner of intersection and did not move for some time. SAs know, through previous training and experience, that this is a tactic utilized by DTOs to determine if law enforcement is surveilling them.

29. SAs then witnessed ATTIPOE drive to a FedEx shipping store approximately 40 minutes away in Simi Valley, California. SAs know that this behavior is odd when there are multiple FedEx stores closer to the Reseda Residence. SAs know that DTOs will use mailing facilities in distant areas to attempt to avoid law enforcement detection. SAs witnessed ATTIPOE drop off a parcel (the "Netherlands Parcel") at the FedEx store and return to the Reseda Residence. Through the observations during the

surveillance, ATTIPOE'S movements indicated his actions were conducted for sole purpose of shipping the Netherlands Parcel.

30. Approximately 5 minutes after ATTIPOE dropped off the Netherlands Parcel, SAs went into the FedEx store to speak with the store manager. The store manager, Adam, recognized ATTIPOE by a description of his appearance and attire. Additionally, Adam reviewed the store's camera footage and saw ATTIPOE drop off the Netherlands Parcel. Adam showed SAs the shipping label, the sender returned a suspected fraudulent name, and the consignee was addressed to the Netherlands. SAs detained and searched the Netherlands Parcel under HSI's border search authority. The Netherlands Parcel had two packages inside within packing peanuts, each packge was labeled "BENTLEY." SAs discovered approximately 2 kilograms of white powder substance which field tested positive for cocaine. The substance was wrapped in similar packaging materials as the previous parcel shipped by ATTIPOE, destined for Australia in November 2023. The parcel previously shipped by ATTIPOE in November 2023 was discovered to contain a substance that subsequently tested positive for methamphetamine.

    **E.    HSI executes a search warrant at the Reseda Residence and seizes multiple kilograms of cocaine and methamphetamine.**

31. On July 24, 2024, the Honorable Charles F. Eick, United States Magistrate Judge, issued a search warrant in matter 2:24-MJ-04387 for the three-bedroom Reseda Residence. HSI

LAX Special Agents, including myself, executed the search warrant.

  32. During the search, SAs discovered a room adjacent to ATTIPOE's room believed to be a processing room for narcotics packaging. No clothes or living materials were found in this room. In the processing room, SAs found various forms of packaging material consistent with the previous seizures to include vacuum sealed bags, a vacuum sealer, a scale, duffel bags, packaging boxes, packing peanuts, packing envelopes, and tape. Located in a duffle bag on top of the bed. SA found 2.4 kilograms of a substance that confirmed in a field test to be cocaine. This cocaine was packaged in the same condition as the Netherlands Parcel, wrapped in plastic and tape with the word "BENTLY". On the floor of this processing room were 1.8 kilograms of a white crystalline substance, that field tested for methamphetamine and was contained in bags on the floor.

  33. In ATTIPOE's bedroom, SAs discovered his passport along with with various notebooks. Next to the headboard of ATTIPOE's bed was an unregistered 9mm semi-automatic handgun with a loaded high capacity magazine containing 13 live rounds in a shoulder bag. Various caliber rounds were also loosely distributed around the bedroom. A small quantity of white power, field tested to be cocaine, was individually packagd and also found in ATTIPOE's bedroom. One of the notebooks in ATTIPOE's bedroom appeared to be a ledger. In the ledger there was a list of "Assets," and "money meth" was handwritten as an asset.

34. SAs also found three cellular phones sealed in faraday bags in the house. The seized evidence is partially included in the photo below.



35. ATTIPOE was detained as he departed the Reseda Residence approximately 60 minutes before the execution of the search warrant for an immigration investigation. After the execution of the search warrant, ATTIPOE was placed under arrest and found to be in the possession of two iPhones on his person: A black iPhone within a black case (SUBJECT DEVICE 1) and a white iPhone within a green case (SUBJECT DEVICE 2).

12

**TRAINING AND EXPERIENCE ON DRUG OFFENSES**

36. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

13

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

  d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

  e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

  f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their vehicles.

  g. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

37. As used herein, the term "digital device" includes the SUBJECT DEVICES.

38. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

15

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

39. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

      a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

40.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the

17

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ATTIPOE's thumb and/or fingers on the devices; and (2) hold the devices in front of ATTIPOE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

41.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//
//
//

## VII. CONCLUSION

42. For all the reasons described above, there is probable cause to believe that ATTIPOE has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 25th day of
July, 2024.

_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

19